IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 1:14CR194-1 |
| | : | 1:14CR414-1 |
| DONALD RAY MORGAN | : | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

NOW COMES the United States of America, by and through Sandra J. Hairston, Acting United States Attorney for the Middle District of North Carolina, and hereby responds in opposition to the motion filed by Defendant Donald Ray Morgan requesting compassionate release. Dkt. #37, 27.[1]

## Summary

Morgan is serving an aggregate 243-month sentence for violations of 18 U.S.C. § 922(g)(1), felon in possession of a firearm, and 18 U.S.C. § 2339B, attempt to provide material support to a foreign terrorist organization.  Dkt. #28, 18.  Morgan requests that this Court modify his two convictions to run concurrently and to reduce his term of imprisonment for attempting to provide material support to a foreign terrorist organization to seven to thirteen years.

---

[1] Citations to the docket refer to case number 1:14CR194 and 1:14CR414, respectively.

Dkt. #37, 27. Morgan provides a number of reasons for this request: first, to care for his mother; second, based on his treatment while in custody at the Bureau of Prisons; third, his completion of several reentry programs; and fourth, a pending § 2255 motion based on *Rehaif*. *Id*. at 2-5.

Regardless of the basis for his request, Morgan must seek compassionate release by first requesting a reduction in sentence (RIS) from the BOP, through the warden of his prison, and then either waiting 30 days for the BOP to respond, or exhausting all administrative rights to appeal, whichever comes first, before moving the district court for a modification or RIS pursuant to 18 U.S.C. § 3582(c)(1)(A). Morgan submitted a RIS to the warden on June 18, 2020, on a similar basis presented in his current motion, which was denied on August 25, 2020. *See* Attachment #1, RIS Request and Denial. There is no indication Morgan appealed this decision.

The government does not contest that Morgan has met the statutory exhaustion requirement and his motion is ripe for consideration. However, Morgan does not meet any of the recognized grounds for relief under § 3582(c)(1)(A). While Morgan's mother's health is certainly unfortunate, it is not an extraordinary and compelling reason for his early release, and nor are any of the other reasons Morgan provides. Even if one of Morgan's stated reasons constituted a valid ground for compassionate release, the § 3553(a) factors strongly militate against early release. His motion should be denied.

2

## Background

On May 27, 2014, a federal grand jury for the Middle District of North Carolina returned an indictment against Morgan for possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Dkt. #1 (14CR194). The U.S. Attorney for the Middle District then filed a single-count Bill of Information charging that Morgan, a United States citizen, attempted to provide material support and resources in the form of personnel (himself), to the foreign terrorist organization al-Qa'ida in Iraq[2], in violation of 18 U.S.C. § 2339B. Dkt. #1 (14CR414). On October 30, 2014, Morgan pleaded guilty to both the possession of a firearm indictment and the attempt to provide material support to foreign terrorist organization bill of information. Minute Entry of 10/30/2014.

The facts established that on March 12, 1997, Morgan was convicted of the felony offense of discharging a firearm into an occupied property and

[2] On October 15, 2004, the U.S. Secretary of State designated al-Qa'ida in Iraq ("AQI"), known at the time as Jam'at al Tawhib wa'al Jihad as a Foreign Terrorist Organization or "FTO" under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224. Dkt. #12, 4 at 1. On May 15, 2014, the U.S. Secretary of State amended AQI's designation as an FTO to also include the aliases of the Islamic State of Iraq and the Levant, or "ISIL," and the Islamic State of Iraq and al-Sham, the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production or "ISIS." *Id*. On June 29, 2014, ISIS announced a formal name change to "Islamic State." *Id*. This entity shall be referred to ISIL/ISIS throughout the remainder of this response.

3

sentenced to 25 to 39 months of imprisonment. Dkt. #12, 4 at 1. In January 2012, Morgan used a shooter's web platform to advertise an AK 47 rifle for sale. *Id*. at 1. Morgan arranged for an interested buyer to come to a business in Salisbury, North Carolina, to complete the transaction. *Id*. at 2. At the business, Morgan opened up a closet which contained many handguns and rifles, as well as ammunition. *Id*. Morgan also offered to sell the buyer two other firearms, which the buyer declined. *Id*. Morgan ultimately sold the buyer a Norinco 7.62 x 39mm rifle and 1,000 rounds of ammunition. *Id*.

This was not the only incident with Morgan providing firearms to other individuals. In October 2014, a different firearm was seized from a third party who stated he got the firearm from Morgan. Dkt. #21, 12 at ¶ 6. This firearm qualified as a destructive device under 26 U.S.C. § 5845(f). *Id*. Morgan's ex-wife also told agents of two instances in which Morgan provided her with a firearm; the first in 1997 before Morgan went to prison, and the second, before Morgan departed for Lebanon in January 2014, Morgan provided her with a rifle (S&W, model M&P15, .223 rifle, later recovered). *Id*. at ¶¶ 7, 8. Purchase records also indicated that Morgan ordered 140 rounds of .223 ammunition in April 2013 from an online gun supply store and five (30-round) .223 magazines from Natchez Shooters Supply and had them shipped to his residence. *Id*.

In June 2014, Morgan orchestrated the sale of a rifle and four magazines for $2,000 through his ex-wife. *Id*. at ¶ 9. Morgan's ex-wife sold the firearm to

4

an undercover officer and said Morgan let her sell the guns in order to help pay for child support. *Id.*

As to the case involving attempted support to a foreign terrorist organization, on or about May 6, 2013, Morgan's Google Plus profile picture depicted a group of individuals, each wearing military gear and posing with automatic rifles, praying. Dkt. #12, 4 at 3-4; *See also* Dkt. #21, 12 ¶ 12. Also during this time frame, Morgan used two different Facebook accounts; one of which had the online name of "Nasser Abdul Raheem" and on November 1, 2013, depicted a background photograph of Usama bin Laden, a black flag commonly associated with the flag of al-Qa'ida, and a profile picture of Morgan. Dkt. #12, 4 at 4; *See also* Dkt. #21, 12 ¶ 12.

In January 2014, Morgan arranged to leave the United States, and on January 22, 2014, he traveled from the Middle District of North Carolina to Beirut, Lebanon. Dkt. #12, 4 at 4; *See also* Dkt. #21, 12 at ¶ 13. When Morgan left his residence in the Middle District, he intended to travel to Syria via Turkey and offer material support to ISIL/ISIS in the form of his services. *Id.*

In February 2014, the Federal Bureau of Investigation ("FBI") located a Twitter account for Morgan. Dkt. #12, 4 at 4; *See also* Dkt. #21, 12 at ¶ 14. From February 2014 to July 2014, Morgan frequently changed Twitter accounts and usernames, but they always contained the numbers 0618. *Id.* In March 2014, the user of "Field Muslim@astranger0618" account posted "Step

5

by step. I have abandon (sic) a comfortable career and life to leave US. Step by step I am closer to fisabilAllah. Are you leaving? [.]" *Dkt.* #12, 4 at 5; *See also* Dkt. #21, 12 at ¶ 15. The same month, FBI agents viewed a Tweet from user "FieldMuslim@astranger@0618" saying, "Reaching that place with Twitter that just feels like a bunch of yappy yappy.  Took a year to leave US.  Won't take that long for step 2[.]" *Id.* On or about May 14, 2014, using the username "Abu Omar al-Amriki@Abu Omar0618," Morgan tweeted, "O you who believe! O you who call yourself muslim! When is the right time to defend your ummah? When will you care? Will you ever be a man?"  Dkt. #12, 4 at 5; *See also* Dkt. #21, 12 at ¶ 16.  With the same username on the same day, Morgan posted, "What truly breaks my heart is not that the United States kills our innocent children and women.  IT'S THE SILENCE OF OUR UMMAH AND LACK OF ACTION."  *Id.*

Several days later, on May 17, 2014, Morgan attempted to travel to Syria via Turkey from Beirut, Lebanon, but was stopped in Turkey and sent back to Beirut.  Dkt. #12, 4 at 5-6; *See also* Dkt. #21, 12 at ¶ 17.  Several days after this attempt, on or about May 20, 2014, Morgan posted the following tweets under the username "Abu Omar@06180620":

"There was jihad today, and there will be jihad tomorrow-sheik Anwar al-Awlaki."

6

"When the US kills innocent muslims they feel an "I'm sorry" is sufficient. If a scum amerikkkan dies, they feel 500K children is justified."

"Ya Allah! Bring strength, courage and victory to our brothers fighting & sacrificing to establish Islamic state. @PaladinofJihad#ISIS."

Dkt. #12, 4 at 5-6; *See also* Dkt. #21, 12 at ¶ 18. Posts like these continued throughout May. Using the username Abu Omar@06180629, on or about May 22, 2014, Morgan posted, "If you have been protesting and campaigning and begging the enemy to stop killing u, It's probably time to get an ak47 and stop that threat." Dkt. #12, 4 at 6; *See also* Dkt. #21, 12 at ¶ 18. On or about that same timeframe, Morgan posted, "I guess there are those of us who are bit softer in nature and will be protestors in the electronic campaigns and those of us who are soldiers." *Id*. On or about May 29, 2014, Morgan posted to Twitter indicating he knew the consequences of his actions, "According to legal jargon. If you RT a supportive tweet about ISIS or favorite a tweet, you have violated their law. So pick your camp." *Id*.

In June 2014, the same Twitter account associated with Morgan posted the following tweet indicating his identification as a part of ISIS saying, "ISIS is worldwide. We are already in your city. It's a name but the actions and struggle is our ibadah and deen. Call us what you want." Dkt. #12, 4 at 7; *See also* Dkt. #21, 12 at ¶ 19. Morgan's postings on Twitter continued to advocate for violence and jihad on behalf of the Islamic state. On or about June 9, 2014,

7

using the same account, Morgan posted, "If the west & it's agenda to target any muslim that is practicing is not clear then u are in trouble. At this point you need hijrah or an AK." *Id.* Also on June 9, 2014, Morgan posted two additional times on Twitter saying, "Syria is not the only area in need of jihad. Every corner of this earth is struggling to denounce and taghout & kafir regimes. You are there now." *Id.* Morgan also posted, "Sec Kerry as you warm muslims can be killed; it goes without saying those attacking muslims can be killed too. Wasted threats, sir." *Id.*

In July 2014, Morgan changed his Twitter account screen name to "Abu Omar al Amreeki@06180629" and continued his support of the Islamic State saying, "Mujahid pledging allegiance to Abu Bakr al-Baghdadi and Islamic State commanding good and forbidding evil." Dkt. #12, 4 at 7; *See also* Dkt. #21, 12 at ¶ 20. From this same account on or about July 5, 2014, Morgan posted a copy of the online magazine *Dabiq*, which is an English language magazine published by ISIL and appears to attempt to recruit fighters, create propaganda, and facilitate the solicitation of funds and finances to ISIL. Dkt. #12, 4 at 8; *See also* Dkt. #21, 12 at ¶ 22. Morgan posted the following Tweets from the Twitter account Abu Omar al Amreeki@06180629:

"Killing our enemies and beheadings are justified." (Viewed by FBI agents on or about July 26, 2014.)

8

"To the brothers inside Syria and Iraq be humble and grateful, many of us are trying to come as some are arrested and others delayed." (Posted on or about July 14, 2014.)

"I've had my fill of Lebanon. Allah open my path." (Posted on or about July 13, 2014.)

"Israel respect nothing and I support any methods to destroy them." (Viewed by FBI agents on or about July 15, 2014.)

"Honestly can we not kill one piece of crap Zionist?" (Viewed by FBI agents on or about July 15, 2014.)

"…It is time to bring death to Israel and stop this bullying once and for all." (Viewed by FBI agents on or about July 15, 2014.)

"Ya Allah give me martyrdom where ever I may be." (Viewed by FBI agents on or about July 15, 2014.)

Dkt. #12, 4 at 7-8; *See also* Dkt. #21, 12 at ¶ 21. All of these posts indicate the support of a terrorist organization and associated ideologies.

On August 2, 2014, Morgan flew into John F. Kennedy International Airport from Frankfurt, Germany, and was arrested on the arrest warrant for case number 1:14CR194-1. Dkt. #12, 4 at 8-9; *See also* Dkt. #21, 12 at ¶ 23. FBI agents interviewed Morgan, and after receiving and waiving his *Miranda* rights, Morgan indicated his Islamic name was "Nasser Abdul Raheem" and acknowledged that he used the online screen names of "Nasser Abdul Raheem,"

9

"Millatu Ibrahim," "Abu Omar," "Field Muslim," and "Abu Omar al Amreeki." *Id*. Morgan denied any plans to conduct an attack against the United States but did state, "one person's hero is another person's terrorist." *Id*. Morgan denied contact with any U.S. citizens or foreign fighters entering Syria to fight for jihad and denied knowing anyone who returned to the U.S. from fighting in Syria. Dkt. #21, 12 at ¶ 23.

Morgan also denied being a follower of Anwar Aulaqi (also known as Anwar al-Awlaki, an American-born Muslim cleric accused of being an operational terrorist leader, killed in a drone strike in September 2011) but implied that he did listen to some of Aulaqi's teachings and tried to take the good things from them. Dkt. #21, 12 at ¶ 24. Morgan told agents that he converted to Islam because of his upbringing and feeling that he must protect those who cannot protect themselves. *Id*. During the interview, Morgan also advised agents that the objective of a Muslim was to have a place to have an Islamic State and practice Sharia law, and though he did not take enjoyment in the violence of an execution he implied he views himself as a solider on the side of Islam. *Id*. at ¶ 25. Morgan's intentions in coming back to the United States were to see his son, go to work, and to get away from social media according to this interview. *Id*. at 26.

On September 3, 2014, a national television network aired a report featuring Morgan. Dkt. #12, 4 at 9; *See also* Dkt. #21, 12 at ¶ 27. This segment

included an interview of Morgan while he resided in Beirut, reportedly conducted during the summer of 2014, in which Morgan said his Islamic name was "Nasser Abdul Raheem" and that "I think [if I go back to the U.S.] there's a strong possibility that they'll charge me with supporting terrorist organizations and with participating in terrorist activities." *Id.* When asked if he thought he was participating in terrorist activities, Morgan said, "Based on their definition, yes." *Id.* Also, in the interview, Morgan said, "someone has to defend Islam and somebody has to defend innocent Muslims," and explained his May 17, 2014, attempt to enter Syria, "I purchased the ticket with the intent of entering Syria, either joining up with medical and food aid convoys or directly with Islamic State." Dkt. #12, 4 at 9-10; *See also* Dkt. #21, 12 at ¶ 27.

On May 13, 2019, the Court sentenced Morgan to 63 months of imprisonment in case 14CR194, consecutive to 180 months of imprisonment in case 14CR414. Dkt. #28, 18. Morgan did not appeal. Since the entry of judgment, on October 19, 2020, Morgan filed a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255, which is currently pending. Dkt. #33, 23. Morgan filed the present motion on July 19, 2021. Dkt. #37, 27.

Morgan is housed at Marion USP in Marion, Illinois. *See* BOP Inmate Locater, at https://www.bop.gov/inmateloc/ (last accessed August 16, 2021). He is scheduled for release (including credit for good conduct time) on May 14, 2032. *Id.*

11

## Discussion

Under the compassionate release provisions of 18 U.S.C. § 3582(c)(1)(A)(i), the district court may modify or reduce an inmate's sentence "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c)(1)(A). If this condition is met and the motion is properly before the district court, the court must also find, after considering the factors set forth in 18 U.S.C. § 3553(a) to the extent that they are applicable, that "extraordinary and compelling reasons warrant a reduction" of the defendant's sentence and that "such reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" *Id*. This includes that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2), p.s. (2018).

If, after considering the § 3553(a) factors to the extent that they are applicable, a court finds that "extraordinary and compelling reasons warrant such a reduction," then the court may "reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of

12

imprisonment)," upon finding that such a reduction is consistent with applicable policy statements, including that "the defendant is not a danger to the safety of any other person or to the community." 18 U.S.C. § 3582(c)(1)(A); U.S.S.G. § 1B1.13.

As to the issue of administrative exhaustion, Morgan has complied with making the requisite request of the warden of his facility for compassionate release, which the warden denied. Morgan is making a claim for release based on family circumstances, his treatment while in custody at the Bureau of Prisons, his completion of several reentry programs, and a pending § 2255 motion based on *Rehaif*. Application Note 1(C) of the compassionate release policy statement specifically states grounds for family compassionate release. They are the death or incapacitation of a caregiver of a defendant's minor child; and the incapacitation of a defendant's spouse or registered partner when the defendant would be the only one available to give care. U.S.S.G. § 1B1.13 cmt. n.1(C). Neither one of these reasons apply here. *See United States v. Goldberg*, 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) (desire to care for elderly parents is admirable but does not qualify under the application note); *United States v. Henry*, 2020 WL 3791849, at *4 (E.D.N.Y July 6, 2020) (providing care for parents is not a qualifying ground for release).

As to Morgan's remaining claims, the only possible legal basis for release would be in Application Note 1(D), "Other Reasons," which provides if there

13

exists in the defendant's case an extraordinary or compelling reason, that may be considered. However, it is for the Court to determine whether Morgan has otherwise met his burden to show that "extraordinary and compelling" reasons merit a sentence reduction under the compassionate release standard. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement outlines what constitutes "extraordinary and compelling reasons," and Morgan's remaining claims do not satisfy this burden. U.S.S.G. § 1B1.13, cmt. n.1(A).[3]

---

[3] Because the Sentencing Commission has not yet updated its policy statement since the passage of the First Step Act in December 2018, several courts, including this one, have found the existing policy statement "provides helpful guidance when considering a motion filed by an inmate, but . . . 'does not constrain the Court's independent assessment of whether "extraordinary and compelling reasons" warrant a sentence reduction under § 3582(c)(1)(A)(i).' *United States v. Beck*, 425 F. Supp. 3d 573, 579 (M.D.N.C. 2019) (internal citations omitted). *See United States v. McCoy*, 981 F.3d 271, 275 (4th Cir. Dec. 2, 2020) (affirming grant of compassionate release to defendants with stacked § 924(c) sentences as "not inconsistent with any applicable policy statement of the Sentencing Commission"). *McCoy* is distinguishable from the present case because *McCoy* involved a disparity of sentences due to a prior mandatory sentencing provision which would result in dramatically shorter sentences today. This is not the case here as there have been no sentencing changes which would otherwise lessen Morgan's original sentence.

14

Morgan relates that he is presently on a hunger strike at the BOP due to his treatment and placement in solitary confinement, and further alleges that he has been harassed, oppressed, and disrespected about his faith. [4]  Dkt. #37, 27, at 2.  These sorts of claims are not appropriate grounds for compassionate relief because, not only are they not contemplated in the policy statement of U.S.S.G. § 1B1.13, they are not the sort of "truly exceptional cases that fall within no other statutory category" and therefore do not meet the burden of demonstrating an "extraordinary and compelling reasons" to justify release. *See McCoy*, 981 F.3d at 287. Morgan has other avenues by which to address these concerns, and he can pursue those routes, but these concerns do not rise to the level of "extraordinary and compelling" reasons.  As to Morgan's contention that he is rehabilitated, as noted in Application Note 3, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13 cmt. n.3.  Morgan submits only three classes and that he's held a job while in BOP, his word that he has been "positively making changes in myself and my surroundings" is insufficient to form a basis for release on the grounds of rehabilitation.  *See United States v. Logan*, 2021 WL 1221481,

---

[4] Morgan contends his complaints have been ignored, but Attachment 3 shows the concerns Morgan has addressed to BOP, in particular one regarding religious bias.

at *5 (D. Minn. Apr. 1, 2021) (rehabilitation, even in combination with other considerations, is usually not compelling: "Prisoners are supposed to follow the rules, take classes, work at a job, and otherwise attempt to improve themselves. That a prisoner does so means that he has met baseline expectations, not that he has done something extraordinary.") Further considering that Morgan's other remaining claims do not state a basis for relief, this contention of rehabilitation is insufficient to support any basis for compassionate release.

As to Morgan's reference to his pending § 2255 claim, this sort of collateral attack on his conviction is not appropriately addressed in a compassionate release motion. *See United States v. Williams*, 2019 WL 6529305 (E.D.N.C. Dec. 4, 2019) ("The arguments defendant makes relate to validity of her conviction and sentence. Motion for a sentence reduction under § 3582(c)(1)(A) are not substitutes for direct appeal or habeas corpus motions."). Even considering all of Morgan's individual claims independently or as a whole, the government contends that Morgan's proffered reasons do not satisfy any possible ground for compassionate release.

Nonetheless, should the Court determine Morgan demonstrates "extraordinary and compelling reasons," which the government strongly maintains he has not, the Court would still need to assess the sentencing factors listed in 18 U.S.C. § 3553(a), as well as the potential danger to the

16

public as required by the policy statement, when determining whether the factors support a sentence modification for Morgan. The record demonstrates they do not.

The § 3553(a) sentencing factors strongly militate against Morgan's early release. As to his history and characteristics, Morgan was noted as a passionate individual who threw himself into whatever he was involved in, particularly with regard to his relationships. Dkt. #21, 12 at ¶ 80, 128. Morgan was also described as "obsessive and compulsive." *Id*. He did appear to have some history of substance abuse, particularly surrounding the time of his state felony conviction, but Morgan claims to not have used alcohol or controlled substances since 2011. *Id*. at ¶¶ 84-87. Morgan does have one serious prior felony conviction, shooting a firearm into an occupied building. *Id*. at ¶ 59. This conviction was based on Morgan shooting into a restaurant after getting into an altercation with the bartender over a beer and although removed in time, it does demonstrate concerning and dangerous behavior of utilizing firearms in response to confrontation. *Id*.

While in custody, Morgan has not been free of disciplinary measures. During his tenure with BOP, he has been involved in six incidents. *See* Attachment #2, Inmate Administrative Remedy; Attachment #3, Inmate Discipline Data. Although the most recent of which was in 2018, the behavior is significant and demonstrates Morgan's continued dangerousness. Morgan

17

has been sanctioned for possession of a dangerous weapon, assaulting another person, encouraging others to riot (which he admitted to doing), threatening bodily harm, punching another inmate, and disruptive conduct. *Id*. These all have a common theme of violence and aggression, suggesting that Morgan continues to pose a danger to the community if released.

Most importantly, the nature and circumstances of this offense strongly caution against any sentence reduction: Morgan attempted to provide material support to a foreign terrorist organization. Throughout 2014, Morgan utilized his social media accounts to broadcast his support for ISIL/ISIS. *Id*. at ¶¶ 12-22. Not only did Morgan voice his support for ISIL/ISIS, he traveled to Lebanon and attempted to enter Syria in order to provide support. *Id*. at ¶ 17.

Morgan's postings on Twitter escalated during the summer of 2014, with posts discussing quelling threats with an AK47, advocating for killing and beheading his enemies, bringing death to Israel, and asking Allah to give him martyrdom. *Id*. at ¶¶ 18, 21. Morgan knew that his actions supported ISIL/ISIS, which was engaged in terrorist activity, and his activities were intended to promote such terrorism. *Id*. at ¶ 17. Morgan clearly supported ISIS, in June 2014 posting to Twitter that "ISIS is worldwide. We are already in your city," and also sharing a photo of the ISIL publication *Dabiq*. *Id*. at ¶¶ 19, 22. He openly pledged his allegiance to Abu Bakr al-Baghdadi (the leader of the Islamic State at the time) and the Islamic State (ISIL/ISIS). *Id*. at ¶ 20.

18

He advocated for jihad and said Syria was not the only place in need of it. *Id.* at ¶ 19. In his interview with agents, Morgan stated that "one person's hero is another person's terrorist," and discussed how he believes in there being an Islamic State and the objective of a Muslim is to have a place to have an Islamic State and practice Sharia law. *Id.* at ¶¶ 23, 25.

In addition to attempting to provide material support to a terrorist organization, Morgan as a convicted felon, involved himself with, sold, and apparently permitted others to sell on his behalf, a number of firearms and large amount of ammunition. Dkt. #21, 12 at ¶¶ 5-9. Possessing firearms as a convicted felon is not only illegal, but Morgan also sold firearms on a number of occasions as well. *Id.*

Morgan's behavior is not just concerning but represents a true danger to the public. At the time of the offense, Morgan was in possession of firearms, broadcasted his support for a terrorist organization, advocated for violence against enemies of the Islamic State, and also took steps to join ISIL/ISIS, including an attempted entry into Syria. All these actions indicate that Morgan remains a danger to the community and does not merit any relief under § 3582(c)(1)(A).

Morgan has served only 34.5 percent of his full term, and early release would be in contravention of the § 3553(a) factors. In particular, a reduction in his sentence would not reflect the seriousness of the offense, promote respect

for the law, or provide adequate punishment and deterrence in light of Morgan's serious criminal offenses. 18 U.S.C. § 3553(a)(2)(A) – (B). As such, the government strongly contends this motion should be denied.

## Conclusion

In light of the foregoing, the Court should deny Morgan's motion for compassionate release.

This the 19th day of August, 2021.

Respectfully submitted,

SANDRA J. HAIRSTON
Acting United States Attorney

/S/ RANDALL S. GALYON
Assistant United States Attorney
NCSB #23119
United States Attorney's Office
Middle District of North Carolina
251 N. Main Street
Winston-Salem, NC  27101
Phone:  336/631-5269

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice will be mailed to the following party:

    Mr. Donald Ray Morgan
    Register No. 80886-053
    USP Marion
    U.S. Penitentiary
    P.O. Box 1000
    Marion, IL 62959

                /S/ RANDALL S. GALYON
                Assistant United States Attorney
                NCSB #23119
                United States Attorney's Office
                Middle District of North Carolina
                251 N. Main Street
                Winston-Salem, NC  27101
                Phone:  336/631-5268